1

2

3

4

5

6

7

8                              **UNITED STATES DISTRICT COURT**

9                              **EASTERN DISTRICT OF CALIFORNIA**

10

11   ANTOEVINO ROCKY SERNA,                  )   Case No.: 1:12-cv-01008 JLT (HC)
                                             )
12                  Petitioner,              )   ORDER DENYING PETITION FOR WRIT OF
                                             )   HABEAS CORPUS
13            v.                             )
                                             )   (Doc. 1)
14   M. MCDONALD,                            )
                                             )
15                  Respondent.              )
                                             )
16   _____)

17          Petitioner Antoevino Rocky Serna is a state prisoner proceeding *in propria persona* with a

18   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

19                                  <u>**PROCEDURAL HISTORY**</u>

20          Petitioner is in the custody of the California Department of Corrections and Rehabilitation. On

21   October 2, 2007, a jury convicted Petitioner of one count of murder for the benefit of a criminal street

22   gang, two counts of attempted murder and two counts of assault with a firearm.  (Lodged Document

23   ("LD") 8)**.**  Also, the jury found true the special circumstance that Petitioner personally discharged a

24   firearm causing great bodily injury and death.  <u>Id</u>.  On December 10, 2007, the Kings County Superior

25   Court sentenced Petitioner to a total indeterminate term of life without the possibility of parole plus 89

26   years. <u>Id</u>.

27          In this petition, Petitioner argues there was insufficient evidence to find him guilty of first

28   degree murder by lying in wait, that the trial court improperly instructed the jury, that the trial court

                                                    1

improperly failed to disclose juror information and that his appellate counsel provided him ineffective assistance. For the reasons set forth below, the petition is **DENIED**.

## **FACTUAL BACKGROUND**

The Court adopts the following Statement of Facts as contained in the Opinion of the 5th District Court of Appeal[1]:

> On the evening of December 23, 2005; appellant and his friends, Ernest Warren, Emanuel "Heeter" Jackson, Elmo Wartson; Lawrence Flax and Marvin Townsend; were talking at the corner of Shaw Place and Eastview Road in Hanford. While the men were gathered at the corner, Celeste Becerra and Jesus Nuno were holding an engagement party at their home across the street. The home had a Shaw Place address and the party was for Ruben Garcia and Flora Aguiniga. Angel Aguiniga Puga, Daniel Gonzales and Veronica Morales were among the party guests and music from a car radio was playing.

> At some point in the evening, appellant and his friends walked across the street and stood next to the fence separating the yard of the Shaw Place home from the sidewalk. Wartson asked Nuno to turn down the music because loud music would draw attention from Hanford Police. Garcia, Puga and Becerra walked up and Stood behind Nuno. Nuno indicated he would lower the volume of the music and people from the two groups began shaking hands over the fence. According to Becerra, the men outside the fence said they were trying to handle business. Once Nuno turned down the music and the groups exchanged handshakes, Becerra thought the matter had been resolved.

> At some point before the handshakes, appellant went into the yard and stood next to Gonzales, who tried to engage appellant in conversation. The two men were located behind Nuno, Garcia, Puga and Becerra. After a time, appellant took a few steps backward, then walked up to Garcia and fired several shots from a handgun at Garcia's head. Garcia died later that day. Appellant also shot Puga in the back, causing paralysis from the, chest down. Appellant shot Nuno in the head, stomach, and leg. Before the shooting occurred, Puga heard someone say, "This is our hood." Warren said he saw appellant come out from behind the group of Mexican-Americans at the engagement party and shoot a gun at someone's head.

> Becerra described the gun as being of a dark color and having no cylinder. She saw appellant hold the gun in the air and then point it downward. When the shooting occurred, Becerra dropped to the ground and crawled to the house to care for her children. Nuno eventnally came inside and said he, Puga and Garcia had been shot. Becerra immediately called 911.

> Puga said he was the brother Flora Aguiniga, who had just gotten engaged to Ruben Garcia. At one point during the engagement party; he noticed the African-American men on the driveway of the party house. Puga knew Flax, Wartson and "Heeter," and said appellant was also present. According to Puga, "Heeter" said the party music was too loud and was going to ruin their "business" by attracting police.

> Puga said the music was not that loud, but they told the African-American men they would lower the volume and everyone shook hands. As Puga shook Flax's hand, he felt a burning sensation in his back and fell to the ground. At first, Puga did not see appellant, but he did see Flax run away. Puga then saw appellant dressed in a black, puffy, hooded jacket. Appellant stepped on Puga's feet and hand as he ran away. Puga said he did not see appellant shoot a gun, but he believed appellant shot him.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Mamie Woodard resided in the vicinity of the shooting and found appellant in her yard after the shooting occurred. Appellant resided in the house behind Woodard's home. Appellant told her he had been at his house and then had run toward the shooting. Woodard gave appellant a ride into Hanford and dropped him off near an apartment building. Appellant spent the night with one Jennifer Neal and changed out of his clothing,

When the shooting occurred, Flax saw a flash near appellant's hand and Flax ran from the scene. Later that evening, Flax saw appellant in the parking lot of the Granary Bar in Lemoore. Appellant said, "They fixin' to go hard' on me if they found out it was' me." In Flax's view, the appellant's remark referred to the shooting.

Officers found some .32 caliber shell casings and a .380 caliber Beretta firearm at the scene of the shooting, A physician removed a .32 caliber bullet from Nuno's leg, but that bullet was not fired from the Beretta. On December 26, 2005, Kings County Deputy Sheriff Tyrus Milton went to Neal's apartment and seized the black jacket that appellant wore on the night of the shooting. Criminalists found gunshot residue on the inside and outside of the right and left pockets of the jacket.

On December 27, 2005, Deputy Sheriff Robert Flores interviewed appellant about the shooting. Appellant denied being at the Shaw Place home but said he may have waved at someone attending the engagement party, Appellant also admitted his association with the Crips criminal street gang.

### Gang Enhancement Evidence

On September 11, 2005, Michael Young and Monique Jackson were traveling in a Chevrolet Tahoe in the Home Garden area of Hanford. Young got into an argument with Laprice Harris, Wartson, Aaron Sparks and "Heeter" Jackson. Tamisha Dodson drove up and gave Sparks a weapon. Monique Jackson and Young drove away in the Chevrolet Tahoe, but heard several gunshots. A bullet pierced the driver's side headrest of the Tahoe and several windows in the vehicle were broken. The shooting of the Tahoe followed a dispute at the Bastille Bar in Hanford.

Kings County Probation Officer Mark Cerda testified as an expert on the Crips criminal street gang. He described the activities of the gang and said appellant, in his opinion, was a member of the gang. Cerda based this conclusion on appellant's tattoos and a letter written to appellant. That letter contained slang used by gang members and the notation "GXCX," Cerda said the primary activities of the gang included murder, drive-by shooting, robbery, burglary, selling drugs and assault. In Cerda's view, the shootings in the instant case benefited the gang by instilling fear in the community by demonstrating a willingness to commit murder.

In Cerda's opinion, appellant was an active participant in the gang at the time of the shooting. Cerda said this was demonstrated by appellant's tattoos, the contemporaneous statement "[t]his is our hood," and the identity of the other people present. Cerda said the shooting benefited appellant as a gang member by showing his lack of fear, preventing future challenges, and heightening his status inside the gang and among rival gangs. Cerda also concluded that Sparks was a member of the Hanford Gangster Crips based on Sparks's criminal history of drug sales and involvement in another drive-by shooting.

### Defense

The defense recalled Deputy Milton to testify on behalf of appellant. Deputy Milton said he interviewed Gonzales about two hours after the shooting. Gonzales could not identify appellant in a photo lineup. However, he did tell Deputy Milton he saw the shooter fire at Garcia's head from close range.

Deputy Julian Lemus interviewed Becerra about three or four hours after the shooting. Becerra told Deputy Lemus she did not see the shooter or the people who were shot. However, on December 26, 2006, Deputy Lemus interviewed Becerra again and she identified appellant as the shooter.

3

Deputy Mark Bevens spoke to Flax on the telephone a few days after the December 23 shooting. Flax denied personal knowledge of tile shooting, but later said he saw appellant fire a weapon that evening.

(LD 8)

## DISCUSSION

### I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

The Antiterrorism and Effective Death Penalty Act of 1996 applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### II.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of the petitioner's claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

4

that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), *citing* Williams v. Taylor, 529 U.S. 326, 405-406 (2000). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., *quoting* Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (*citing* Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786.

As the Supreme Court of the United States has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 131 S.Ct. at 786, (*quoting* Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-11 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788.

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. *See* Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal

habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's claims de novo. Id.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

## III. Petitioner's Claims

In his instant petition, Petitioner raises several grounds for relief. As discussed below, the Court rejects all of Petitioner's.

### A. There is sufficient evidence to support the "lying in wait" charge

Petitioner contends that there was insufficient evidence to support the jury's finding on the lying in wait charge. This contention is without merit.

#### 1. The opinion of the Court of Appeal

The Fifth District Court of Appeal rejected Petitioner's claim as follows:

On appeal, appellant contends "[t]he first degree murder conviction based on [a] lying in wait theory must be ,reversed because the record does not contain evidence showing a substantial period of watching and waiting for an opportune time to act." In reviewing a criminal conviction for the alleged lack of evidentiary support, an appellate court must review the whole record in the light most favorable to the judgment. The appellate court must determine whether the record discloses substantial evidence, i.e.,

6

evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.) The appellate court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. If the circumstances reasonably justify the findings of the trial court; reversal is not warranted simply because the circumstances might also be reconciled with a contrary finding. The test on appeal is whether there is substantial evidence to support the conclusion of tile trier of fact and not whether guilt is established beyond a reasonable doubt. (*People v. Williams* (1971) 5 Ca1.3d 211, 214.)

The definition of lying in wait has its origin in *People v. Morales* (1989) 48 Ca1.3d 527,557 (Morales). The Morales case addressed the issue of a lying-in-wait special circumstance. (*People v. Poindexter* (2006) 144 Cal.App4th 572, 578.) A special circumstance based on a lying in wait theory requires an intent to kill while a first degree murder by lying in wait does not. [Footnote][2] Nevertheless, the durational element of lying in wait is the same for the special circumstance as it is for first degree murder based upon lying in wait. (*People v. Stevens* (2007) 41 Cal.4th 182,202, fn. 11.) The element of lying-in-wait murder include (1) concealment of purpose; (2) a substantial period of watching and waiting for an opportune time to act; and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. The question whether a lying-in-wait murder has occurred is often a difficult one that must be made on a case-by-case basis, scrutinizing all of the surrounding circumstances. (*Morales, supra*, at pp. 557- 558.)

The *Morales* factors, including the requirement of a "'substantial period'" of watching and waiting, are part of the factual matrix required both for first degree murder, under a lying-in-wait theory and for the lying-in-wait special circumstance. The jury instruction language need not exactly track the language of *Morales* to define adequately the required elements for either definition. (*People v, Poindexter, supra*, 144 Cal.App.4th at pp. 584-585.) The principal component of lying in wait is the waiting of a defendant for the opportunity to take the victim by surprise by concealing his or her murderous purpose to gain the advantage of ambush or surprise. (*People v. Superior Court (Jurado)* (1992) 4 Ca1.App.4th 1217, 1227.)  No particular length of time is required to show lying in wait. A jury instruction sufficiently reflects the *Morales* requirement of a watching and waiting for a "'substantial period'" if it is sufficient to demonstrate that defendant had a state of mind equivalent to premeditation' or deliberation." (*People v. Poindexter, supra*, at p. 585, citing *People v. Ceja* (1993) 4 Ca1.4th 1134, 1139-1140.) Moreover, lying in wait does not require that a defendant launch a surprise attack at the first available opportune time. The defendant may wait to maximize his or her position of advantage before taking the victim by surprise. (*People v. Lewis* (2008) 43 Ca1.4th 415,510.)  Even if the period of waiting is relatively short, that period is sufficient if it negates any inference that the defendant murdered as the result of panic or sudden impulse. (*People v. Moon* (2005) 37 Ca1.4th 1, 24.)

In the instant case, appellant was initially outside of the yard where the engagement party was taking place. Deputy Milton spoke with Nuno, who said the conversation and handshaking between the two groups took up several minutes. At some point, appellant crossed into the fenced yard and approached the victims from behind. Gonzales, Warren, Becerra, Puga and Flax testified that appellant appeared in the yard and stood behind the group of victims. Once appellant positioned himself inside the yard, he did not start shooting. Instead, he first stood right next to Gonzales. Appellant had the hood of his bulky black jacket on his head and placed his hands in his pockets. Gonzales tried to engage appellant in conversation and made several

---

[2] In footnote 4, the Court observed, "The Supreme Court has deemed 'lying in wait' to be the functional equivalent of proof of premeditation, deliberation and intent to kill. Thus, a showing of lying in wait obviates the need to separately prove premeditation and deliberation. (*People v. Hardy* (1992) 2 Cal.4th 86, 162.)" (Doc. 14-1 at 9)

statements, such as "'Man this is messed up, can't we all get along?'" Appellant replied to those statements by saying "'Hum.'" Appellant stepped back and Gonzales stepped back with him. Gonzales then told appellant, "'You know what, Homey ... [t]his fight's on them .... I don't even know who they are.'" After Gonzales made 'a few more remarks, appellant again said "'Hum'" and took another step backward and went behind Gonzales. Appellant turned halfway away from the fence, then turned around, walked 10 or 12 feet to Ruben Garcia, put the gun to Garcia's temple and fired.

The foregoing sequence of events negated any inference that appellant murdered Ruben Garcia as a result of panic or sudden impulse. As an encounter of several minutes unfolded, appellant did not immediately fire his weapon. Instead, he moved from outside of the fenced residence on Shaw Place to inside the yard where the engagement party was taking place. After Gonzales stood with and attempted to make conversation with appellant, the latter positioned himself behind Gonzales, produced a firearm, crossed a distance of 10 to 12 feet and discharged the weapon into the temple of Ruben Garcia. The evidence was sufficient to support the giving of CALCRIM No. 521 and to support a judgment of conviction of first degree murder based upon lying in wait.

(LD 8)

## 2.    Federal Standard related to sufficiency of the evidence claims

In order to prevail on a sufficiency of the evidence argument, petitioner must not only show that no reasonable jury could have come to the conclusion that it did, Jackson v. Virginia, 443 U.S. 307, 318–19 (1979), but also that no reasonable appellate court could have upheld the verdict under this standard. Juan H. v. Allen, 408 F.3d 1262, 1278 (n.14) (9th Cir.2005). See also Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir.2011) (discussing a "double dose of deference" for sufficiency of the evidence issues).

Under Jackson, the Court must review the entire record when the sufficiency of the evidence is challenged on habeas.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir.1991); see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  A

jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

### 3.      Analysis

Petitioner argues that the "watching and waiting duration was not substantial."  (Doc. 28 at 8) He argues that there must be "proof of a considerable period of watching and waiting for an opportune time to act" to establish that he lay in wait.  Id. at 9. For this proposition, Petitioner relies upon People v. Stevens, 41 Cal.4[th] 182, 202 n.11 (2007).  First, the cited portion fails to address whether there is any specific durational requirement for the waiting period for lying-in-wait may be found.  This footnote merely takes notes that prior precedent determines that "for a murder conviction and for a special circumstance finding the lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."  Id.

Second, the holding of Stevens makes clear that lying-in-wait does not require any specific amount of time to pass except that which is sufficient to "show a state of mind equivalent to premeditation or deliberation."  Stevens, at 202.  Notably, Stevens found significant where evidence dispelled any inference the defendant acted rashly or upon an impulse and noted that, "[e]ven  a short period of watching and waiting can negate such an inference." Id. at 203.  This holding is the same as that issued in People v. Morales, 48 Ca1.3d 527, 557 (1989), which was relied upon by the 5th DCA.

At trial, the evidence presented demonstrated that after the initial contact between the two groups, Petitioner positioned himself behind the victims.  Gonzales attempted to engage him in conversation but Petitioner refused to engage.  Appellant backed up and positioned himself again behind the victims before walking the 10 to 12 feet to Ruben Garcia, putting the gun to his temple and firing.  The 5th DCA determined this demonstrated that he acted not in panic or impulse but deliberately.  This was supported further by the fact that the encounter with Gonzales lasted several minutes before Petitioner finally shot Garica, which was sufficient time for Petitioner to act with consideration.  Therefore, the 5th DCA's conclusion that sufficient evidence supported each element of the crime of first degree murder by lying-in-wait was not objectively unreasonable.

///

9

**B.      The claim related to the instructional error fails to provide a basis for federal habeas relief**

Petitioner contends that the trial court erred in instructing the jury using CALCRIM 521 which he contends lessened the burden of proof and conflated the meanings of the key phrases.  As in the previous argument, this contention is without merit.

**1.      The opinion of the Court of Appeal**

The Fifth District Court of Appeal rejected Petitioner's claim of instructional error as follows:

> Appellant contends CALCRIM No. 521 erroneously conflated definitions for the intent to kill, express malice, willful action, and premeditation and deliberation, thereby significantly lowering the prosecution's burden of proof.
>
> CALCRIM No. 520 (murder with malice aforethought (§ 187)), as read to the jury, states:
>
>> "[Appellant] is charged in Count I with murder.
>> "To prove that [appellant] is guilty of this crime, the People must prove that:
>> "1.      [Appellant] committed an act that caused the death of another person; and
>> "2.      When [appellant] acted, he had a state of mind called malice aforethought.
>> "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.
>> "[Appellant] acted with express malice if he unlawfully intended to kill.
>> "[Appellant] acted with implied malice if:
>> "1.      He intentionally committed an act;
>> "2.      The natural consequences of the act were dangerous to human life;
>> "3.      At the time he acted, he knew his act was dangerous to human life; and
>> "4.      He deliberately acted with conscious disregard for human life.
>> "Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes, death is committed. It does not require deliberation or the passage of any particular period of time.
>> "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."
>
> CALCRIM No. 521 (murder: degrees (§ 189)) as read to the jury; states:
>> "If you decide that [appellant] has committed murder, you must decide whether it is murder of the first or second degree.
>> "[Appellant] has been prosecuted for first degree murder under two theories: One, the murder was willful, deliberate, and premeditated; and two, the murder was committed by lying in wait. . .

10

"Each theory of first degree murder has different requirements, and I will instruct you on both.

"You may not find [appellant] guilty of first degree murder unless all of you agree that the People have proved that [appellant] committed murder. But all of you . . . do not need to agree on the same theory.

[Appellant] is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [Appellant] acted willfully if he intended to kill. [Appellant] acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [Appellant] acted with premeditation if he decided to kill before committing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate ... and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is ... the extent of the reflection, not the length of time.

"[Appellant] is guilty of first degree murder if the People have proved that [appellant] murdered while lying in wait or immediately thereafter. [Appellant] murdered by lying in wait if:

"1.      He concealed his purpose from the person he killed;
"2.      He waited and watched for all opportunity to act; and
"3.      Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time; but its duration must show a state of mind equivalent to deliberation or premeditation. Deliberation means carefully weighing the considerations for and against a choice and knowing the consequences, deciding to act. An act is done with premeditation if the decision to commit the act is made before the act is done.

"A person can conceal his or her purpose even if the person killed is aware of the person's physical presence,

"The concealment can be accomplished by ambush or some other secret plan.

"All other murders are of second degree.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime, If the People have not met this burden, you must find [appellant] not guilty of first degree murder."

CALCRIM No. 522 (provocation: effect on degree of murder), as read to the jury, states:

"Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that [appellant] committed murder but was provoked ... consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether [appellant] committed murder or manslaughter."

The California Supreme Court has consistently rebuffed challenges to CALJIC No. 8.20, the predecessor to CALCRIM No. 521. (*People v. Millwee* (1998) 18 Cal.4th 96,135, fn. 13; *People v. Perez* (1992) 2 Cal.4th 1117, 1123; *People v. Lucero* (1988) 44 Cal.3d 1006, 1021.) The two instructions are conceptually comparable. Both inform the jury that killings with premeditation and deliberation are of the first degree. Both

11

inform the jury that deliberation requires not only a careful weighing of the considerations for and against a proposed choice, but also knowledge of the consequences before deciding to kill. Both inform the jury that the test of whether a decision to kill results from premeditation and deliberation is not the length of time but the extent of reflection. On review of a challenge to jury instructions, our duty is to consider the entire charge, not just parts of an instruction or a particular instruction. (*People v. Castillo* (1997) 16 Ca1.4th 1009, 1016. As CALCRIM No. 521 informed appellant's jury that murder not of the first degree is of the second degree, so CALCRIM No. 522 stated that provocation may reduce a murder from first degree to second degree.

On appeal, we presume jurors are intelligent people capable of understanding, correlating, and following the instructions and applying them to the facts of the case. (*People v. Carey* (2007) 41 Ca1.4th 109, 130; *People v. Alfaro* (2007) 41 Ca1.4th 1277, 1326.) The standard of review of an instruction challenged on appeal as ambiguous is whether there is a reasonable likelihood that the jury applied the instruction in a way that denied fundamental fairness. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72-73; *People v. Clair* (1992) 2 Ca1.4th 629,663.) Appellant has failed to make such a showing and his contention must be rejected.

LD 8.

## 2.      Federal Standard related instructional error

As a general rule, a claim that a trial court violated state law by giving an erroneous instruction is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 71–72 (1991); Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir.1986). The only question for federal review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right]" (internal quotation marks omitted)). A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. *See* Calderon v. Coleman, 525 U.S. 141, 146 (1998).

When a jury instruction is susceptible to a reading that would render the verdict unconstitutional and another that would generate a proper verdict, the reviewing court considers the challenged instruction in light of the full jury charge and in the context of the entire trial.  See Cupp, 414 U.S. at 145-147(consider charge as whole); United States v. Park, 421 U.S. 658, 675 (1975)(consider context of whole trial).  The court must then decide whether there is a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner.  Estelle, 502

U.S. at 72.  A verdict remains valid if a jury instruction only tangentially undercut a proper beyond-a-reasonable-doubt instruction.  <u>Cupp</u>, 414 U.S. at 149-150.

### 3.    Analysis

Petitioner argues that the instructions CALCRIM 520 and 521 "conflated the determinative issues before the trier of fact, significantly lowered the prosecution's burden of proof, and left the jury without any basis for holding petitioner culpable under an intentional second degree murder."  (Doc. 28 at 11)  The Court disagrees.

First, CALCRIM 521 expressly told the jury that it had to determine the degree of murder *but only if* it already found Petitioner committed murder.  To find Petitioner had committed murder, the jury had to find malice.  One way of doing this, the jury was instructed, was if the jury found Petitioner acted with an intent to kill.  Despite Petitioner's argument to the contrary, finding Petitioner acted with malice would not require the jury to find the Petitioner guilty of first degree murder.

Instead, to find first degree murder, the jury also had to find Petitioner acted with deliberation and premeditation.  This could be shown either because Petitioner decided to kill before committing the act or because he lay in wait for a period of time sufficient to consider whether to kill and made this decision before acting.  Failing this, the jury was instructed to find second degree murder, i.e., "All other murders are of second degree."  Neither CALCRIM 521 nor CALCRIM 522 reduced the burden of proof to less than proof beyond a reasonable doubt and, when read together, precluded a finding of second degree murder.

Notwithstanding Petitioner's tortured argument to the contrary, the instructions did not conflate anything.  To form his argument, Petitioner selects certain phrases of the instructions to consider in isolation.  For example, Petitioner argues that an intent to kill and a decision to kill are the same.  Even if the two terms are the functional equivalent of the same concept—and the Court does not accept that they are—unless there was also evidence this decision was made before the act of killing, first degree murder would not be shown.  No reasonable juror could have thought that an intent to kill without consideration before the act of killing would suffice for a conviction of first degree murder.  Moreover, California courts, including the 5th DCA, have held that the instructions given here correctly state California law and these determinations are entitled to deference.  *See* <u>Bradshaw v.</u>

<u>Richey</u>, 546 U.S. 74, 76 (2005) (per curiam ). *See also* <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) (federal habeas courts do not reexamine state court determinations on state law questions).  Finally, there is no clearly established federal law to be misapplied or misconstrued in regards to CALCRIM Nos. 520 and 521. Thus, there is no habeas relief is available and the petition is **DENIED**.

### C.      The claim related the trial court's refusal to provide juror information

Petitioner contends that the trial court erred in failing to give his trial counsel information that would have allowed her to contact jurors to determine the extent to which the jurors participated in the deliberation process.  The Court disagrees.

### 1.      The opinion of the Court of Appeal

The Fifth District Court of Appeal rejected Petitioner's claim related to the refusal of the trial court to grant access to jury information as follows:

> Appellant contends the trial court abused its discretion by denying the defense access to juror contact information in order to investigate juror misconduct.
> On November 29, 2007, appellant filed a motion to continue sentencing and a petition to release juror identifying information (Code Civ. Proc., §§ 206, 237), alleging Juror No. 11 slept through jury proceedings and had to be continually advised to wake up. Defense counsel's declaration in support of the motion to continue stated in pertinent part:
>
> "1.      I am the attorney for [appellant].
> "2.      This case is presently set for sentencing on December 3, 2007 at 10:30 a.m. in Department 6.
> "3.      That the continuance of the sentencing for at least 30 days is necessary so that the defense investigator may conduct investigation to determine whether defense may have grounds to file a Motion for New Trial ...
> "4.      After the trial was concluded, I was contacted by Juror #6, who informed me that throughout most of the deliberations in the jury room, Juror #11 slept through most of the proceedings and had to be continually aroused.
> "5.      [Appellant] is willing to waive time for sentencing."
>
> Defense counsel's declaration in support of the petition stated:
>
> "1.      I am the attorney for [appellant].
> "2.      This case is presently set for sentencing on December 3, 2007 at 10:30 a.m. in Department 6.
> "3.      After the trial was concluded, I was contacted by Juror #6, who informed me that throughout most of the deliberations in the jury room, Juror # 11 slept through most of the proceedings and had to be continually aroused.
> "4.      The release [of] juror identifying information is necessary for the defense to prepare a motion for new trial."
>
> On November 30, 2007, the district attorney filed written opposition to the petition, contending:

14

"[Appellant] presents no evidence or allegations that the jury received evidence out of court or engaged in any improper discussions. The conduct alleged is not improper. In point of fact i[t] would be entirely proper for jurors to wake a sleeping juror so that the sleeping juror could rejoin deliberations. [¶] Disclosure of juror identifying information is not necessary to develop a motion for a new trial because no evidence is admissible to show the effect of such conduct upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined .... "

On December 3, 2007, the court heard arguments on the petition and the following exchange occurred:

"[DEFENSE COUNSEL]: Your Honor, after the jury trial I was contacted by, juror number 7. [J]uror number 7 is the juror that was released from jury duty I believe on a Friday because her husband had been hit by a drunk driver and he was in the hospital and apparently in very serious condition. But that juror contacted me somewhat after the trial and was speaking to me about her experience as a trial [juror]. One of the issues that she brought up was her concern about the validity of the verdict in light of the fact that I believe it was juror number 11, she had indicated that much of the deliberations when she was there, she slept through most of those deliberations and had to be repeatedly woken up by the other Jurors.

"She—and the Court made a statement in chambers, she was not present to the conclusion of the trial, but I'd like to remind the Court as to the conduct of that juror. Repeatedly throughout the trial the Court was informed by I know at least [the bailiff] about that juror sleeping through trial. There was discussions I know at the bench about … concerns about that juror actually sleeping throughout the trial.

"The Court … took many breaks particularly because of the concern about that particular juror sleeping or falling asleep. That juror at the onset of the trial indicated I believe that much of what she was hearing or was to hear was boring and that made her fall asleep. [¶] … [¶]

"So the conduct that was explained to me by juror number 7 is absolutely consistent with what was observed throughout the trial. And while I do understand that that particular juror was not there ... to the end of the proceedings, it not unbelievable to believe that that particular juror would [have] continued the same type of behavior through the end of trial.

"So the motion is a motion to continue so that I can examine these issues and determine whether or not my client has it right to file a motion for a new trial based on juror misconduct.

"Now, along with that motion is the motion to unseal the juror identifying information in order for me to make a determination as to whether or not a motion for a new trial should be brought, and as the Court's aware, it has to be brought prior to sentencing.

"I need to have my investigator question the other jurors about that conduct of which I have been informed by juror number 7. And in, order for me to do that, I need to actually have access to the jurors who are willing to speak to the defense about those particular issues. [¶] … [¶]

"So with that I filed a motion to continue this sentencing, and in conjunction with that a motion to release juror identifying information; so that we can in an expeditiously perform an investigation and then ultimately file the motion if we think it's proper. So at this point that's the basis for my motion to continue. [¶] … [¶]

"THE COURT: [Prosecutor]?

15

"[PROSECUTOR]: Well, we had a trial on this case and at the end of the trial all 12 jurors came back into the courtroom with their guilty verdict. Each juror was polled and asked if that was their verdict and each one said that that was their verdict, guilty on every count.

"Now, at this point counsel says, without any authority whatsoever, that somehow it would be misconduct for a juror to fall asleep during deliberations, wake up and rejoin deliberations after being told to wake up. And what she wants us to do is go on a fishing expedition and talk to all these jurors about their thought processes during the jury deliberations, which she's not entitled to offer at a motion for a new trial, with absolutely no showing of good cause and no showing of authority.

"[W]e oppose the motion to disclose juror identification information, and the authorities on this are quite clear. It's not something that you get willy-nilly. It's something that you have to show good cause for. Counsel has not shown it and she's not shown good cause for continuance.... "

The court subsequently took the motion and· petition under submission and continued the matter for one week. On December 10, 2007, the court denied the motion and petition, stating:

"There is nothing in the record that indicates defense is unable to contact jurors without the sealed information. Defense counsel does not represent that she did not have a record of the names of the jurors or that she had attempted unsuccessfully to find addresses or telephone numbers for jurors whose names she did have. . ....

"In the case of <u>People versus Jefflo</u> [(1998)] ... 63 Cal.App.4th, 1314, in the absence of such a showing there is no basis for concluding that the Court's denial of the motion for disclosure would prevent defense counsel from contacting any of the jurors.

"There is a consensus among the appellate courts that that good cause requirement set forth in <u>People versus Rhodes</u>, Penal Code Sections 206 and 237 incorporate the Rhodes public policy balancing test for disclosure of sealed juror information. That test requires the defense to show a reasonable probability that misconduct occurred, that the defense made diligent but unsuccessful efforts to contact jurors by other means, and that, further investigation is necessary to provide the Court with adequate information to rule on a motion for new trial. It's <u>People versus Rhodes</u> [(1989)] ... 212 Cal.App.3d, 541.

"Moreover, the declaration[s] set forth by defense do not explain how the juror's conduct was of such a character as is likely to have influenced the verdict improperly as recognized by the Court in <u>People versus Bowers</u>, [(2001)] 87 Cal.App,4th, 722, although a defendant has a right to a trial by jury, a party's right to have its case decided by a jury does not necessarily include the right to compel jurors to discuss issues that they have chosen to decide without discussion. Even in those instances where allegations have been made of a juror sleeping during trial testimony, which is not the case here that has been set forth by the defense, it has been held that the fact that a juror falls asleep during the trial is not grounds for disturbing the verdicts if it does not appear that his sleep was for such a length of time or at such a stage of the trial as to affect his ability fairly to consider the case.

"In addition ... in reviewing the declaration, it appears that the juror [who] has spoken to the defense was not one of the jurors that ultimately reached a verdict in this matter. Furthermore ... at the time when the verdict has been reached, all jurors, all new jurors that had been put back into the jury field were ordered to renew their discussions and discuss the case anew and that they did before rendering their verdict in the matter. For these reasons the Court's

16

denying defense motions and the petition to unseal juror information."

"A criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict." (*People v. Cox* (1991) 53 Cal.3d 618, 698-699, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390,421, fn. 22.) "'[S]trong public policies protect discharged jurors from improperly intrusive conduct in all cases.' [Citations.] The uncontrolled invasion of juror privacy following completion of service on a jury is, moreover, a substantial threat to the administration of justice. [Citations.] These concerns, however, must be balanced with the equally weighty public policy that criminal defendants are entitled to jury verdicts untainted by prejudicial juror misconduct. [Citations.]  (*Townsel v: Superior Court* (1999) 20 Cal.4th 1084, 1092.)

Sections 206 and 237 of the Code of Civil Procedure govern petitions for disclosure of juror identifying information, which information automatically sealed upon the recording of a verdict in a criminal case. (Code Civ. Proc., § 237, subd. (a)(2).) Code of Civil Procedure section 206 authorizes a criminal defendant to petition pursuant to Code of Civil Procedure section 237 for access to personal juror identifying information when the sealed information is "necessary for the defendant to communicate with jurors for the purpose of developing 'a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206; subd. (g).) Code of Civil Procedure section 237 provides that the petition must be supported by a declaration that includes facts sufficient to establish good cause for the release of the jury information, If the court determines that the petition and supporting declaration establish a prima facie showing of good cause for release of the juror information, the court must set a hearing, unless the record establishes a compelling interest against disclosure, (Code Civ. Proc., § 237, subds, (b), (c), (d).) If a hearing is set, then the trial court shall give the former juror or jurors notice they may appear in person or in writing to protest the granting of the petition. (Code Civ.Proc., § 237, subd. (c).) A former juror's protest shall be sustained if, in the court's discretion, "the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure ... , or the juror is unwilling to be contacted by the petitioner."(Code Civ. Proc., § 237, subd. (d).) The trial court's ruling is reviewed for abuse of discretion. (*People v. Jones* (1998) 17 CalAth 279, 317.)

To demonstrate good cause, a defendant must set forth "a sufficient showing to support a reasonable belief that jury misconduct occurred." (*People v. Rhodes, supra,* 212 Cal.App.3d at p.552.) The misconduct alleged must be "'of such a character as is likely to have influenced the verdict improperly.'" (*People v. Jefflo, supra,* 63 Cal.Ap.4th at p. 1322.) 'Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported. (*People v. Wilson* (1996) 43 Cal.AppAth 839,852; *People v. Rhodes, supra,* at pp. 553-554.) Even where good cause exists, juror identifying information may not be had if the record establishes a compelling interest against disclosure to protect the jurors from threats. (Code Civ. Proc., § 237, subd. (b).)

Nothing in the instant record suggests that defense counsel was unable to contact the trial jurors without the sealed information. Moreover, the declarations in support of the defense motion and petition were based upon information from Juror No. 7, who was excused from service due to a serious vehicular injury to her spouse. At the time Juror No.7 was excused and replaced by Juror No. 74 on October l, 2007, the court instructed the jury as follows:

"The alternate juror must participate fully in the deliberations that lead to any verdict. The People and [appellant] have the right to a verdict reached only after full participation of the jurors whose votes determine that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set-aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place."

Even if Juror No. 7's information was accurate, the trial court did not abuse its discretion in denying appellant's petition requesting identifying juror information because Juror No.7 was not present for the deliberations that ultimately led to the verdicts of guilt. Moreover, a juror must not be discharged for sleeping unless there is convincing proof the juror actually slept during trial. The bare fact of sleeping at an unknown time for an unknown duration and without evidence of what, if anything, was occurring in the jury room at the time is insufficient to support a finding of juror misconduct or to conclude the juror was unable to perform his or her duty. (*People v.Bowers, supra*, 87 Cal.AppÄth at p. 731.) .

Here, defense counsel's declarations were based upon the statements of a juror who was excused prior to the deliberations leading to the verdicts of guilt. Counsel's declarations did not support a reasonable inference or belief of jury misconduct and the trial court properly concluded that appellant failed to make the requisite showing of good cause for disclosure of jury identifying information.

LD 8.

## 2.    Federal Standard

Petitioner raises a number of complaints related to the action of the trial court in denying his counsel sealed juror information.  (Doc. 28 at 16)  He claims that the trial court erred because his counsel was not obligated to attempt "self-help"—meaning, attempt to locate the jurors herself first—before applying to the court for release of the sealed information, that his counsel was not obligated to demonstrate a prejudicial impact on the deliberations before the information was revealed and there was significant evidence the juror slept during trial.[3]  Id.  Notably, all of these claims sound in state law and, therefore, are not cognizable on federal habeas corpus review. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[It] is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Hubbart v. Knapp, 379 F.3d 773, 779–80 (9th Cir.2004). "[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution." Duggar v. Adams, 489 U.S. 401, 409 (1989).

To the extent that Petitioner alleges a violation of federal law, his broad reference to the Due Process Clause of the Fourteenth Amendment fails to provide a federal basis for his claims.  Notably,

---

[3] California Code of Civil Procedure § 237(a)(2) provides that "[u]pon the recording of the jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information ... consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section." To obtain this information, a party must make "a prima facie showing of good cause for the release." Cal.Code Civ. Proc. § 237(b). "Good cause" requires "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for a new trial." People v. Rhodes, 212 Cal.App.3d 541, 552 (1989).

the cases cited by Plaintiff—that a sleeping juror may constitute a mistrial—do not apply here where the issue is not whether a juror was sleeping but whether the trial court should have permitted his trial counsel to have sealed juror information.  Thus, Petitioner fails to identify clearly established United States Supreme Court authority in support of the proposition that he has a federal constitutional right to obtain juror personal identifying information or to perform a post-verdict investigation of the jury's verdict. Indeed, a thorough search reveals no such Supreme Court precedent in support of Petitioner's claim. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." See, e.g., Brewer v. Hall, 378 F.3d 952, 955 (9th Cir.2004).  To the contrary, in Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir.2003), the Ninth Circuit Court of Appeals held, "Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias [or misconduct] is raised."

    In any event, good cause to unseal juror information did not exist. Petitioner failed to make a sufficient showing to support a reasonable belief that juror misconduct occurred during deliberations or to demonstrate that further investigation into his allegations was necessary or appropriate. Moreover, the 5th DCA expressly determined that, as a matter of state law, the trial court properly denied Petitioner's request for juror personal identifying information. The state court's interpretation and application of state law is binding on this court. Bradshaw, 546 U.S. at 76 (citing Dows v. Wood, 211 F.3d 480, 485–86 (9th Cir.2000)). Thus, Petitioner is not entitled to federal habeas corpus relief on this claim.

### D.    Ineffective assistance of appellate counsel

    Petitioner contends that his appellate counsel was ineffective for failing to assert that his trial attorney failed to object to a particular jury instruction.  As in the previous grounds, this contention too is without merit.

### 1.    Superior Court opinion

    The Kings County Superior Court rejected Petitioner's claim he received ineffective assistance of appellate counsel both on failure to state a claim upon which relief could be granted and on failure

to file his writ in a timely manner as follows:

Petitioner ANTOEVINO ROCKY SERNA ("Petitioner"), filed a petition for writ of habeas corpus on December 24, 2009 ("petition"). The petition alleges that, in connection with the appeal of his conviction and sentence in Kings County Superior Court Case No. 05CM5577, Petitioner's appellate counsel improperly failed to raise an issue of juror bias. Petitioner alleges that, prior to being seated, Juror No.7 heard a statement from the mother of a witness indicating that her daughter had been beaten by Petitioner. The record indicates that multiple inquiries into the incident were undertaken by the court. The record also confirms that Juror No.7 was seated following her confirmation that she could be a neutral and unbiased arbiter of guilt or innocence. In her letter dated August 14, 2008, appointed counsel (Susan D. Shors) confirmed that she did consider raising the juror issue on appeal, "but because the witness never testified, I concluded there was insufficient basis for an appellate issue."

The standard of review for an ineffective assistance of counsel claim is well settled. A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. To establish a claim of incompetence of counsel, a defendant must establish both that counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-688, 694-695; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.) To prevail, a defendant must establish incompetence of counsel by a preponderance of evidence. (*People v. Ledesma, supra*, 43 Cal.3d at p. 218.) As an ineffective assistance of counsel claim fails on an insufficient showing of either element, a court need not decide the issue of counsel's alleged deficiencies before deciding if prejudice occurred. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126, cert. den. *sub nom. Rodrigues v. California* (1995) 516 U.S. 851, 133 L. Ed. 2d 93.) In addition, "[c]ourts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Kelly* (1992) 1 Cal.4th 495, 522-523; *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

In this case, appellate counsel appears to have made a well informed and considered decision to not pursue the issue of juror bias on appeal. The allegations set forth within the petition are insufficient to establish actual bias on the part of Juror No.7, error on the part of the trial court in its questioning of Juror No.7 and/or that a reversal of the conviction in Kings County Superior Court Case No. 05CM5577 would have occurred had the issue been raised on appeal. Petitioner bears a heavy burden initially to provide facts sufficient to support his claims. (*People v. Duvall* (1995) 9 Cal.4th 464,474.) Having failed to meet such burden in this case, IT IS HEREBY ORDERED, the petition is denied. (*People v. Duvall* (1995) 9 Cal.4th 464,474.)

(LD 8)

## 2.    Federal standard for ineffective assistance of counsel

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986).

First, a petitioner must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-

20

88.  Second, a petitioner must establish he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Moreover, in evaluating counsel's performance, courts are obligated to be highly deferential to the decisions and tactics employed. Strickland, 466 U.S. at 689.

Initially, the Court notes that the Kings County Superior Court properly applied Strickland to Petitioner's claim.  Thus, the only question is whether, having applied the correct test, the state court's application of Strickland was objectively unreasonable. Schriro v. Landrigan, 550 U.S. at 473. The Court concludes that it was not.

In Smith v. Phillips, 455 U.S. 209, 217 (1982), the Court held,

> . . . due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Along these lines, in Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir.1990), the Court held that bias is presumed only in "those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial" or where there is the "potential for substantial emotional involvement, adversely affecting impartiality." Courts look to whether it is "highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988), cert. denied, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989).

Here, a juror reported she heard the mother of a prospective witness say that Petitioner had beaten her daughter and went to prison as a result.  However, upon examination by the court and

counsel, the juror stated that she didn't know whether this information was true[4], could put the information out of her mind and would judge only the evidence presented in the trial. (LD 1, Vol. 15 at 2977-2986)  The juror committed to being fair and impartial and committed that the information would not bear on her deliberations. Id. at 2980-2982.  Petitioner's trial counsel argued that further voir dire was warranted in light of the fact that evidence had been presented at the trial that Petitioner had been convicted of an assault previously. Id. at 2981.  However, the juror reported that despite having heard the trial testimony, the information would not bear on her deliberations. Id. Thus, further inquiry was not warranted. As a result, the Court cannot find that it is highly unlikely the juror refused to comply with her obligation to consider only the evidence admitted at trial during the deliberations.

Indeed, in his traverse Petitioner merely rejects the veracity of the juror's assurances that she was committed to being fair and committed to not considering the information she had heard and posits that the juror was biased.  Though he objects that he is not relying upon a "bare belief" in the juror's bias, he cites to no evidence or authority that his contention is anything else.

The Court does not find that appellate counsel's failure to raise the issue of the juror's bias to be unreasonable.  An appellate attorney has no obligation to raise frivolous issues or those which have little chance of succeeding.  Indeed, "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989).  The Miller Court continued,

> Like other mortals, appellate judges have a finite supply of time and trust; every weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court. For these reasons, a lawyer who throws in every arguable point—"just in case"—is likely to serve her client less effectively than one who concentrates solely on the strong arguments. [Footnote] Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue. Such is the case here.

Id., footnote omitted.  Thus, the Court does not find that appellate counsel's performance in the direct appeal fell below an objective standard of reasonableness.  Thus, because there was no reasonable

---

[4]  Indeed, the juror reported she believed the information may have referred to Michael Young and his girlfriend, rather than Petitioner. Id. at 2981.

1  probability that raising this issue on direct appeal would have succeeded and no prejudice resulted

2  therefrom, the decision of the Kings County Superior Court was not contrary to or an unreasonable

3  application of clearly established federal law.  Therefore, the petition is recommended to be **DENIED**.

4  **ORDER**

5         Accordingly, the Court **ORDERS** that Petitioner's Petition for Writ of Habeas Corpus

6  (Doc. 1), is **DENIED** with prejudice on its merits.

7

8  IT IS SO ORDERED.

9     Dated:   __March 14, 2014__              __/s/ **Jennifer L. Thurston**__

10                                         UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28